UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MORRIS CM ENTERPRISES, LLC,

    Plaintiff,

v.

WINGSTOP FRANCHISING, LLC,

    Defendants.

WINGSTOP FRANCHISING LLC,

    Counter-Claimant,

v.

MORRIS CM ENTERPRISE, LLC, and MICHAEL MORRIS,

    Counter-Defendants.

No. 2:19-cv-02306-KJM-CKD

ORDER

On December 20, 2019, the court heard defendant and counterclaimant Wingstop Franchising LLC's motion for a preliminary injunction against counter-defendants Morris CM Enterprise LLC and Michael Morris. At hearing, Karen Marchiano appeared for Wingstop Franchising LLC. Counsel for Morris CM Enterprise and Michael Morris did not appear. Having considered the moving papers and the arguments of counsel, the court now GRANTS the motion.

1

# I. FACTUAL BACKGROUND

On November 15, 2019, defendant and counterclaimant Wingstop Franchising LLC ("Wingstop") removed from Sacramento County Superior Court the suit filed there by plaintiff and counter-defendant Morris CM Enterprises, LLC ("Morris CM") for wrongful termination of Morris CM's franchise, breach of the covenant of good faith and fair dealing and interference with economic relations. Not. of Removal, ECF No. 1. The same day, Wingstop counterclaimed for violations of the Lanham Act and breach of contract, adding Michael Morris, the principal officer of Morris CM as a counterdefendant. ECF No. 5. On November 19, 2019, Wingstop moved for a preliminary injunction. ECF No. 8. Morris CM and Michael Morris ("the Morris Parties") did not timely file an opposition and as noted have not otherwise appeared.

In 2008, Morris CM entered into a franchise agreement with Wingstop Restaurants Inc., a national restaurant franchise specializing in chicken wings. Compl., ECF No. 1 ¶ 6. Wingstop Restaurants Inc. subsequently assigned its interest in the franchise agreement to Wingstop Franchising LLC, the counterclaimant in this action. Countercl., ECF No. 5 ¶ 23. The franchise agreement granted Morris CM the right to operate a Wingstop restaurant at 3541 N. Freeway Blvd., Suite 115, Sacramento, California. Compl. ¶ 6; Countercl. ¶ 20. The parties renewed their agreement under a renewal rider on December 6, 2017. Countercl. ¶ 20. Michael Morris was a guarantor of Morris CM's obligations under the franchise agreement. *Id.* ¶ 6.

Wingstop, Inc. owns a variety of trademarks and copyrights used to denote its restaurants. *Id.* ¶¶ 10-19. In the franchise agreement and subsequent renewal, Wingstop granted Morris CM a license to use various components of Wingstop's intellectual property. *Id.* ¶¶ 20, 24; Franchise Agreement, ECF No. 8-7 at 22-25.[1] Wingstop granted Morris CM the use of several federally registered trademarks to distinguish its restaurant. Countercl. ¶ 11. Wingstop also furnished Morris CM with a license to use copyright protected operations and advertising materials and protected trade secrets (collectively the "Wingstop System") in operating its restaurant. *Id.* ¶¶ 15-16.

---

[1] Citations to the Franchise Agreement use the internal pagination of the document.

2

Wingstop alleges Morris CM agreed to discontinue use of all Wingstop intellectual property on termination of the franchise agreement. *Id.* ¶ 25. The Franchise Agreement states, in relevant part,

> Upon the expiration or termination of the franchise, Franchisee must immediately discontinue all further uses of the Marks and Copyrighted Materials and take appropriate action to remove the Marks from the premises in which the Restaurant is located, to cancel any advertising relating to Franchisee's use of the Marks or the Copyrighted Materials, including yellow pages listings, and to cancel or withdraw any assumed or fictitious name filings covering Franchisee's use of Company's trade name. Franchisee acknowledges and agrees that failure or refusal to comply fully with these requirements will constitute willful trademark and copyright infringement.

Franchise Agreement at 12(a)(10).

Morris CM agreed it would take these remedial steps within seven days of any termination of the franchise. Countercl. ¶ 29; Franchise Agreement at 17(a). If it did not, Wingstop would be entitled to injunctive relief without the necessity of posting a bond. Franchise Agreement at 17(c), (h).

Wingstop further alleges Morris CM agreed to comply with all federal, state and local laws and regulations applicable to the operation of the restaurant. Countercl. ¶ 28; Franchise Agreement at 7(c)(20). The franchise agreement obligated Morris CM to pay Wingstop weekly royalties of 5 percent of gross sales and contribute 4 percent of gross sales to an advertising fund. Countercl. ¶¶ 26, 27; Franchise Agreement, 8(a)(1); 10(a), (b).

Morris CM allegedly breached these provisions of the franchise agreement by failing to pay royalties when due and failing to contribute to the ad fund since May 2019. Countercl. ¶¶ 30, 31; Declaration of Steven Link ("Link Decl."), ECF No. 8-2, ¶ 26; Ex. H, ECF No. 8-11. Wingstop also alleges Morris CM failed to pay approximately $450,000 dollars in sales taxes owed to the California Department of Tax and Fee Administration, putting Morris CM in breach of the clause requiring compliance with state law, including tax law. Countercl. ¶¶ 32-34.

On April 25, 2019, Wingstop received a notice from the California Department of Tax and Fee Administration (CDTFA) that Morris CM's seller's permit had been suspended for

failure to pay sales tax. Link Decl., ECF No. 8-3, ¶ 24; Ex. F, ECF No. 8-9. On May 20, 2019, Wingstop sent a notice of default to Michael Morris noting low operational assessment scores, failure to pay ad fund contributions and royalties, and failure to pay expenses such as rent, point-of-sale service provider fees and sales taxes. Link Decl. ¶ 25; Ex. G, ECF No. 8-10.

On September 10, 2019, Wingstop sent another notice of default to the Morris Parties, this time focused on the failure to pay ad fund contributions and royalties, as well as the tax delinquency. Countercl. ¶ 35; Ex. D to Countercl., ECF No. 5-4; Link Decl. ¶ 27; Ex. I, ECF No. 8-12. The Morris Parties did not cure the defaults. Countercl. ¶ 36; Link Decl. ¶ 28.

On October 11, 2019, Wingstop notified the Morris Parties the franchise agreement was terminated based on the failure to cure the defaults. Countercl. ¶ 37; Ex. E to Countercl., ECF No. 5-5. The notification letter told the Morris Parties to comply immediately with the post-termination obligation to remove Wingstop trade dress from the restaurant and discontinue use of Wingstop's trademarks and other intellectual property. Link Decl. ¶ 29 & Ex. J, ECF No. 8-13.

Wingstop alleges Morris CM continues to use the Wingstop marks, the Wingstop System, display Wingstop trade dress and hold the restaurant out as a Wingstop franchisee. Countercl. ¶ 38. Morris CM has taken none of the agreed-upon steps to remove trade dress and marks identifying the restaurant as a Wingstop franchisee. *Id.* ¶ 45. Steven Link avers he visited the restaurant on November 7, 2019, nearly a month after the termination letter, and found it still operating using Wingstop trademarks and identifiers. Link Decl. ¶¶ 33-35.

As a result, Wingstop alleges Morris CM and Michael Morris have violated the Lanham Act by continuing to use Wingstop's intellectual property after termination of the franchise. Countercl. ¶ 49. It claims such acts constitute trademark infringement and unfair competition under 28 U.S.C. § 1114(1) and 28 U.S.C. § 1125(a), respectively. *Id.* ¶¶ 49, 54. Wingstop alleges the infringement causes irreparable injury necessitating injunctive relief. *Id.* ¶¶ 50-52, 55-57. Wingstop also alleges breach of contract. *Id.* ¶ 59. On November 19, 2019, Wingstop brought this motion for a preliminary injunction.

/////

## II. LEGAL STANDARD

A preliminary injunction preserves the relative position of the parties until trial on the merits or the case is otherwise concluded. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "A preliminary injunction is an extraordinary remedy never awarded as of right[,]" *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion[,]" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original)). In determining whether to issue a preliminary injunction, federal courts must consider whether the moving party "[1] is likely to succeed on the merits, . . . [2] is likely to suffer irreparable harm in the absence of preliminary relief, . . . [3] the balance of equities tips in [the movant's] favor, and . . . [4] an injunction is in the public interest." *Winter*, 555 U.S. at 20.

The Ninth Circuit sometimes employs an alternate formulation of the *Winter* test, referred to as the "serious questions" test. *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012). "'A preliminary injunction is appropriate when a plaintiff demonstrates… that serious questions going to the merits were raised and the balance of hardships tips strongly in the plaintiff's favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 986-87 (9th Cir. 2008)) (internal quotations omitted)). Under the "serious questions" approach to a preliminary injunction, "[t]he elements of the preliminary injunction test must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). *Winter* was decided after the initial articulation of the "serious questions" test, but does not overrule it. *Cottrell*, 632 F.3d at 1135. However, the "serious questions" test must be applied in conjunction with review of the other two *Winter* factors, likelihood of irreparable injury and whether the injunction is in the public interest. *Id*. No matter which approach is taken, a court must balance the competing alleged harms while considering the effects on the parties of the granting or withholding of the injunctive relief. *Winter*, 555 U.S. at 24. A court must also consider the public consequences of the extraordinary remedy. *Id*.

/////

III. DISCUSSION

A. Serious Questions Test

i. Merits of Wingstop's Claim

Wingstop asserts it has a high likelihood of success on the merits of its Lanham Act and contract claims. On the record before it, the court agrees. As a threshold matter, Wingstop must demonstrate that Morris CM violated the operative franchise agreement. The franchise agreement confers a license for Morris CM to use the Wingstop intellectual property to operate a Wingstop restaurant; if the agreement remains in force, there is no infringement.

Wingstop shows Morris CM breached the franchise agreement through the Declaration of Steven Link. Specifically, Wingstop shows that Morris CM failed to pay royalties and ad fund contributions when due (Ex. H, ECF No. 8-11), and failed to pay state sales taxes, resulting in the revocation of its CDTFA seller's permit (Ex. F, ECF No. 8-9). These exhibits are hearsay, but Morris CM has not objected to their consideration. In addition, district courts have considerable discretion to consider inadmissible evidence when determining whether to issue a preliminary injunction. *Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006).

Taken as a whole, the Link Declaration and the exhibits thereto present a compelling case that Morris CM has been in breach of the franchise agreement since at least May 20, 2019. Therefore, on the breach of contract claim, Wingstop has demonstrated both serious questions going to the merits as formulated in the Ninth Circuit and a probability of success under *Winter*, 555 U.S. at 20.

The next question then is whether Wingstop's claims for trademark infringement and unfair competition raise serious questions going to the merits. The court analyzes unfair competition and trademark infringement together for the purposes of the instant motion. "[T]he courts have uniformly held that common law and statutory trademark infringement are merely specific aspects of unfair competition." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1031 (C.D. Cal. 2011). To succeed on its claim for trademark infringement under 15 U.S.C. § 1114(1), Wingstop must show (1) the presence of a valid and protectable trademark; and

(2) that defendant's use of the mark "is likely to cause consumer confusion." *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006). "A claim for false designation of origin under 15 U.S.C. § 1125 requires proof of the same elements as a claim for trademark infringement under 15 U.S.C. § 1114." *Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F. Supp. 2d 890, 897 (C.D. Cal. 2014). Wingstop's federal registration of the Wingstop marks is prima facie evidence of its ownership of the marks. 15 U.S.C. §§ 1057(b), 1115(a); *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999). Regardless of which Lanham Act claim the court analyzes, the "ultimate test" is whether the public is likely to be deceived or confused. *New West Corp. v. NYM Co. of Calif., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979).

Wingstop has provided evidence that it owns, through assignment, the Wingstop marks. Link Decl. ¶¶ 4-7; Ex. B, ECF No. 8-5; Ex. C, ECF No. 8-6. Morris CM does not challenge the validity of the marks. Federally registered trademarks are subject to judicial notice when their validity is not in dispute. Fed. R. Evid. 201(b)(2); *see also Sakura Finetek U.S.A., Inc. v. Sci Gen, Inc.*, No. CV 16-0881 FMO (SSx), 2017 WL 2464441, at *8 fn. 4 (C.D. Cal. 2017). Similarly, Wingstop has made a sufficient showing that the Wingstop System, consisting of copyright protected marketing and operations materials and processes subject to trade secrets protection, is a protected asset. Link Decl. ¶¶ 12-15. Wingstop has shown a protected interest in its intellectual property.

Likelihood of confusion exists when "a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing the marks or names at issue in the case." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012) (citing *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002)). In cases with more difficult facts, the court should apply an eight-factor test set out in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). The *Sleekcraft* factors are guides to help the court determine the question of probability of confusion under the totality of the circumstances. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290-91 (9th Cir. 1992) (citing *Eclipse Assoc. Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990)).

"These tests were never meant to be requirements or hoops that a district court need jump through to make the determination." *Eclipse Assoc. Ltd.*, 894 F. 2d at 1118.

Here, the question is not so complex as to require a multi-factor analysis under *Sleekcraft*. Morris CM and Michael Morris held out their restaurant to the public as a Wingstop location, using the Wingstop marks under a license. The license has been revoked, but Morris CM continues to use the Wingstop marks. Because Morris CM has done nothing to dispel the public's impression that the business is an authorized Wingstop franchisee, there is a high probability of consumer confusion. Cases treating similar situations have drawn the same conclusion. *See, e.g., IHOP Franchising, LLC v. Hameed*, No. 2:14-CV-1752-TLN-CKD, 2015 WL 429547 at *4 (E.D. Cal. Feb. 2, 2015) (former IHOP franchisee's continued use of trademarks confusing); *Hollywood Athletic Club Licensing Corp. v. GHAC-CityWalk,* 938 F.Supp. 612, 614 (C.D. Cal. 1996) (former licensee's continued use of "Hollywood Athletic Club" mark after termination of license confusing). It is difficult to imagine how any customers of the now-terminated franchisee restaurant could conclude they were not dining at an authorized Wingstop franchise.

Thus, Wingstop has demonstrated serious questions going to the merits of its counterclaims.

ii. Balance of Hardships

The benefit of granting the injunction to Wingstop sharply outweighs the harm to Morris CM. Wingstop's inability to control its marks and the resulting harm to public goodwill toward its brand is significant and difficult to quantify in money damages. *See generally* 7-*Eleven, Inc. v. Dhaliwal*, No. 12-CV-02276-KJM-GGH, 2012 WL 5880462 at *7 (E.D. Cal. Nov. 21, 2012) (citing *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1028-29 (C.D. Cal. 2011)). Although Morris CM would presumably be financially harmed by the removal of Wingstop branding from the restaurant, that harm is precisely the risk any business that misappropriates trademarks assumes. "'Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown to be infringing, such an argument in defense merits little consideration.'" *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 924 F. Supp.

8

1559, 1574 (S.D. Cal. 1996) (quoting *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988)). The court finds the balance of hardships tips sharply in Wingstop's favor.

## B. Irreparable Injury

A plaintiff seeking a preliminary injunction must demonstrate a likelihood of irreparable harm. *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). Loss of control over a business reputation and the ensuing damage to goodwill in the marketplace may constitute irreparable harm. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001). A former franchisee's unauthorized use of its former franchisor's trademarks can "significantly reduce[ ]" the franchise's "ability to control [the] reputation and goodwill associated with the marks." *Wetzel's Pretzels,* 797 F. Supp. 2d. at 1028. The resulting customer confusion causes the franchise "substantial and irreparable harm." *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009).

Wingstop has demonstrated that Morris CM's continued use of its marks will cause it irreparable harm. The restaurant in question continues to identify itself as a Wingstop eatery. Link Decl. ¶¶ 33-36. The customers who patronize the restaurant likely believe they are at a licensed Wingstop franchise, yet Wingstop cannot control the quality of those customers' dining experience. Even absent degradation of the franchisor's reputation for quality, loss of control of a trademark alone may constitute irreparable harm. *7-Eleven*, 2012 WL 5880462, at *7 (citing *TGI Friday's Inc. v. Great Nw. Rests., Inc.*, 652 F. Supp. 2d. 763, 772 (N.D. Tex. 2009) ("Courts have held that a franchisor suffers a risk of injury to its reputation and the value of its marks even if the alleged infringer offers superior services.")). But beyond that, Wingstop has offered evidence that the customer experience at the former franchisee restaurant falls below acceptable franchise standards, causing patrons of the restaurant to associate Wingstop with poor quality. *See* Link Decl., Ex. G, ECF No. 8-10 (notice of default warning of low scores on operational assessments). Harm to the reputation conveyed by the Wingstop marks and associated intellectual property is not lightly remedied. Thus, Wingstop has demonstrated a likelihood of irreparable injury.

9

### C. Public Interest

The public interest at stake in the trademark context is the right of the public not to be deceived or confused. *CytoSport,* 617 F. Supp. 2d at 1081 (citing *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008); *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001)). "When a trademark is said to have been infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control his products' reputation." *Id.* (citation omitted).

Morris CM has advanced no countervailing public interest. The court has found a likelihood of public confusion, and thus issuing an injunction would be in the public interest.

### D. Bond

Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In setting the amount of security, the district court has discretion as to the amount. and indeed, whether to require security at all. *Johnson v. Couturier*, 572 F. 3d 1067, 1086 (9th Cir. 2009) (citing *Jorgensen v. Cassiday*, 320 F. 3d 906, 919 (9th Cir. 2003)). The district court may dispense with the bond requirement if it concludes there is "no realistic likelihood of harm to the defendant from enjoining [its] conduct." *Jorgensen*, 320 F. 3d at 919 (citing *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).

Morris CM has advanced no evidence it will be harmed by the issuance of an injunction, and the court will not engage in conjecture on its behalf. In addition, the parties expressly agreed to waive the bond requirement should injunctive relief become necessary. Franchise Agreement at 17(h).[2] Although their decisions are not binding on this court, other district courts in this circuit have held such bond waiver clauses enforceable. *See, e.g., Just*

---

[2] "In addition to the preceding rights and remedies, Company may obtain injunctive relief, without bond, against Franchisee and/or any other Person bound under Section 23 restraining the unauthorized or violative use of any Mark, item of Copyrighted Materials or Trade Secret, with or without terminating the franchise."

*Tacos, Inc. v. Zezulak*, No. CV 11-00663 DAE-KSC, 2011 WL 6140866 at *11 (D. Haw. Dec. 9, 2011). Accordingly, the court will not require Wingstop to post a bond for the injunction to issue.

    IV. <u>CONCLUSION</u>

  For all the foregoing reasons, the court hereby

  1. ENJOINS Morris CM Enterprise LLC and Michael Morris, and their agents, servants, and employees, and all those individuals in active concert or participation with them, from:

   a) Using the following trademarks, or any trademark, service mark, logo or trade name that is confusingly similar to the following trademarks, in connection with the operation of any restaurant or for any other purpose.

    i. Wing-Stop (block letters) ®, registration no. 2,121,699, registered December 15, 1997.

    ii. WING-STOP THE WING EXPERTS & Design (Original Logo) ®, registration no. 2,422,672, registered January 23, 2001.

    iii. WING-STOP THE WING EXPERTS & Design (2014 Logo) ®, registration no. 4,720,379, registered April 14, 2015.

    iv. WING-STOP THE WING EXPERTS & Design (in color) (2014 Logo) ®, registration no. 4,842,661, registered October 27, 2015.

    v. WINGSTOP (block letters) ®, registration no. 3,054,484, registered January 31, 2006.

    vi. THE WING EXPERTS (block letters) ®, registration no. 3,087,485, registered May 2, 2006.

    vii. THE BONELESS WING EXPERTS (block letters) ®, registration no. 3,185,734, registered December 19, 2006.

/////

b) using Wingstop's copyright protected material (including but not limited to
   i. manuals used in the development, operation, and marketing activities of a Wingstop restaurant, including, but not limited to, the Operations Manual;
   ii. training materials;
   iii. restaurant plans and specifications;
   iv. menu board designs and graphics;
   v. product identification posters and photographs;
   vi. advertising and marketing materials;
   vii. labels, forms, and reports provided by Wingstop; and
   viii. computer software developed by Wingstop or as works for hire for use in the operation of the restaurants) in connection with the operation of any restaurant or for any other purpose;
c) using Wingstop's confidential and proprietary information (regarding, among other things, customers, marketing plans and information, prices, recipes, operating systems, suppliers, and similar information with respect to products or services of Wingstop) in connection with the operation of any restaurant or for any other purpose; and
d) identifying their former Wingstop restaurant as a current or former Wingstop restaurant; and

2. ORDERS Morris CM Enterprise LLC and Michael Morris to file with the court and to serve upon Wingstop's counsel, within fourteen (14) days after entry of this preliminary injunction order, a written report, under oath, setting forth in detail the manner in which they have complied with this order.

DATED: January 3, 2020.

_____
UNITED STATES DISTRICT JUDGE